# In the United States Court of Federal Claims

No. 11-788C

(Filed Under Seal:  March 28, 2012)

(Reissued for Publication:  April 2, 2012)

| | |
|---|---|
| ************************************* * <br> CLINTON REILLY, * <br>  * <br> Plaintiff, * <br>  * <br> v. * <br>  * <br> THE UNITED STATES, * <br>  * <br> Defendant, * <br>  * <br> and * <br>  * <br> CANNERY VENTURE LP, * <br>  * <br> Defendant-Intervenor. * <br> ************************************* * | Post-award Bid Protest; Standing; Actual or Prospective Bidder or Offeror; Waiver; Direct Economic Interest; Delay in Filing Protest; Laches. |

*David S. Black*, with whom were *Robert C. MacKichan*, Jr., *Jacob W. Scott*, and *Kelly A. Kyrystyniak*, Holland & Knight, LLP, McLean, Virginia, *Robert R. Moore* and *Bryan L. Hawkins*, Allen Matkins Leck Gamble Mallory & Natsis LLP, San Francisco, California, for Plaintiff.

*Michael D. Austin*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Scott D. Austin*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, *Mark Ezersky*, Of Counsel, U.S. General Services Administration, San Francisco, California, for Defendant.

*V. Blair Shahbazian*, Murphy Austin Adams Schoenfeld LLP, Sacramento, California, for Defendant-Intervenor.

OPINION AND ORDER[1]

WHEELER, Judge.

This bid protest involves the allegations of Plaintiff, Clinton Reilly that he was wrongly excluded from competing for a General Services Administration ("GSA") building lease in Sacramento, California.  The leased space was to house a Military Entrance Processing Station for the Department of Defense.  Mr. Reilly has leased his building to the GSA for this purpose since 1995 and is the incumbent lessor.  Mr. Reilly claims that the GSA acted arbitrarily when it excluded him from competing for the new lease based upon a setback requirement, which the GSA later relaxed in awarding the lease to Defendant-Intervenor, Cannery Venture, LP ("Cannery").

Mr. Reilly learned of this procurement in January 2010 through a pre-solicitation notice, where the GSA announced its need for 30,000 rentable square feet, subject to an 83-foot setback requirement.  A few weeks later, the GSA informed Mr. Reilly's realtor that the Reilly property could not be considered for award because it did not meet the setback requirement.  In May 2010, the GSA issued a Solicitation for Offers ("SFO") to five potential offerors but excluded Mr. Reilly.  On September 29, 2010, the GSA awarded the new lease to Cannery, the only offeror.  However, the GSA failed to publish any notice of its award to Cannery, and Mr. Reilly claims to have been hampered in learning the procurement's status.  Ultimately, believing that the GSA impermissibly relaxed the setback requirement for Cannery, Mr. Reilly protested unsuccessfully to the Government Accountability Office ("GAO") on June 10, 2011, and he commenced his action in this Court on November 21, 2011.

At first glance, Mr. Reilly's protest challenging his exclusion from the competition 21 months after the fact, and 14 months after lease award, would appear to be untimely.  The timeliness of the protest is clouded, however, by the fact that the GSA did not provide the SFO to Mr. Reilly in May 2010 and did not publish any notice of award to Cannery in September 2010.  Moreover, the GSA negotiated extensions of the lease in Mr. Reilly's building, and the Government still has not moved out of his building to occupy the new Cannery space.  This lack of communication from the GSA, coupled with the Government's continued presence in his building, left Mr. Reilly somewhat in the dark as he attempted to follow relevant factual developments.

Still, for the reasons explained below, Mr. Reilly knew that he had a basis for protest no later than May 31, 2011, when he learned of the lease award to Cannery the previous September.  Following the GAO's dismissal of his protest as untimely on July 13, 2011, Mr. Reilly opted to await the outcome of internal governmental discussions to

---

[1] The Court issued this decision under seal on March 28, 2012 and invited the parties to submit proposed redactions of any competition-sensitive, proprietary, confidential, or other protected information on or before April 4, 2012.  The parties have informed the Court that they have no proposed redactions.

2

see whether the contemplated relocation to the Cannery space actually would take place. An additional four-month delay occurred before Mr. Reilly filed suit in this Court. Despite apparent confusion with the GSA that could have been avoided through better communications, the Court concludes that Mr. Reilly delayed unreasonably in filing his bid protest, and thus his claims are barred by the doctrine of laches.

Background

I. Preliminary Matters

On February 3, 2012, counsel for Plaintiff filed a motion to supplement the administrative record, or in the alternative, to supplement the Court's record, with the declarations of Clinton Reilly, Bruce Hohenhaus, and Christian Diggs. Plaintiff's motion is GRANTED IN PART and DENIED IN PART. For the limited purpose of determining standing, prejudice, and laches, the aforementioned declarations are admitted into the Court's record. See East West, Inc. v. United States, 100 Fed. Cl. 53, 57-58 (2011) (admitting declarations into the court's record for the limited purpose of making any prejudice determinations). For the same reasons, the Court also GRANTS Plaintiff's March 2, 2012 motion to supplement the Court's record with Clinton Reilly's third declaration.

In addition, on March 13, 2012, counsel for Plaintiff filed a motion for leave to file a second amended complaint to add as a Plaintiff in this action Mr. Reilly in his capacity as trustee of the Clinton T. Reilly Family Trust. In its motion, Plaintiff explained that in 2001, Mr. Reilly had transferred title to his Sacramento property to the Trust but that Mr. Reilly retains control over the property as the sole trustor, trustee, and beneficiary under the revocable trust. Plaintiff sought to add Mr. Reilly as trustee to address a technical defect raised by Cannery in its cross-motion for judgment on the administrative record. For good cause shown, the Court GRANTS Plaintiff's motion.

II. Statement of Facts

Plaintiff, Clinton Reilly is an individual who owns the building located at 3870 Rosin Court, Sacramento, California (hereinafter "the Reilly property"). Amended Complaint ¶ 1 (Jan. 11, 2012). On November 9, 1995, Mr. Reilly entered into a ten-year lease of the property with the GSA, acting on behalf of the U.S. Department of Defense ("DoD"), Military Entrance Processing Station ("MEPS"). Second Reilly Decl. ¶ 2. A MEPS determines an applicant's qualifications for enlistment in the armed services based upon military service standards. AR 10.[2] During the tenure of Mr. Reilly's lease with

---

[2] Throughout this opinion, "AR" refers to the Administrative Record in this case.

the GSA, the Reilly property housed a MEPS. Pursuant to the most recent extension, the lease was due to expire on December 31, 2011. Second Reilly Decl. ¶ 2.

In anticipation of the lease expiration, on January 21, 2010, the GSA posted a pre-solicitation notice (hereinafter "the Notice") on the Federal Business Opportunities website ("FedBizOpps"), stating its desire to lease approximately 30,000 rentable square feet of office space in Sacramento or West Sacramento. See AR 357-58. The Notice listed several requirements for the space, including that the leased building must be Class A, contiguous, and have an "83 foot setback ONLY IF the Government occupies more than 25% of the rentable square footage of the offered building."[3] AR 357 (emphasis in original). The Notice also stated that expressions of interest should include a map illustrating that the offered building is not located within the 100-year flood zone. AR 358. Notably, the Notice did not reference the "Department of Defense Unified Facilities Criteria: DoD Minimum Antiterrorism Standards for Buildings" (hereinafter "the DoD Standards"), which contain alternative means of compliance for existing buildings that do not satisfy the 83-foot standoff distance. See AR 357-58; DoD Standards § 2-4.8.2 (Feb. 2012).

On January 26, 2010, GSA leasing specialist, Xitlaly Aranda sent an email containing the information in the Notice to ten brokers in the Sacramento area, including Bruce Hohenhaus, the broker for Clinton Reilly Holdings. See AR 1825, 1830. The next day, Mr. Hohenhaus sent Ms. Aranda an email, offering the incumbent Reilly property for the GSA's consideration. See id. On his email to Ms. Aranda, Mr. Hohenhaus copied "clint@clintonreilly.com." AR 1830. During a telephone conversation in January or February 2010,[4] Ms. Aranda informed Mr. Hohenhaus that the GSA would pursue other properties because the Reilly property did not meet the 83-foot setback requirement. See AR 1826. Mr. Reilly does not contest that the his property fails to meet the 83-foot setback requirement. After her conversation with Mr. Hohenhaus, Ms. Aranda represented that no one on behalf of Mr. Reilly ever again communicated to her a desire to participate in the procurement with the incumbent Reilly property. AR 1826.

---

[3] The "setback," also referred to herein as the "standoff distance," is the distance between the building and areas containing vehicles, including roads and parking. As set forth in the "DoD Minimum Antiterrorism Standards for Buildings," referenced frequently throughout this opinion, the setback requirement serves "to keep terrorists as far away from inhabited DoD buildings as possible." DoD Antiterrorism Standards for Buildings § 2-3.1 (Feb. 2012), available at http://www.wbdg.org/ccb/DOD/UFC/ufc_4_010_01.pdf. The DoD Standards further state that "[t]he easiest and least costly opportunity for achieving appropriate levels of protection against terrorist threats is to incorporate sufficient standoff distance into project designs." Id.

[4] In their respective declarations, Mr. Hohenhaus submits that the conversation with Ms. Aranda occurred on February 19, 2010, see Hohenhaus Decl. ¶ 5, while Ms. Aranda submits that it occurred in late January, see AR 1825. For purposes of this opinion, it is not significant when exactly the conversation took place. The Court merely seeks to explain the cause for ambiguity in the opinion.

Based upon the expressions of interest submitted to the GSA, on February 18, 2010, the agency conducted a market survey of approximately 16 properties, including the property of the eventual awardee, Cannery Venture LP. See AR 547-48. In the "General Comments" section of the market survey of Cannery's property ("The Cannery"), a GSA representative noted that "due to large building's square footage – ATFP is met at this location." AR 565. ATFP refers to the Antiterrorism/Force Protection requirements of the DoD Standards, which include the setback requirement and the proviso that the setback requirement applies only if the Government occupies more than 25% of the rentable square footage of the offered building. See AR 760.

On the basis of the market survey, the GSA sent SFO 9CA2463 to five potential offerors on May 3, 2010. See AR 757, 806, 810-17. The GSA did not provide a copy of the SFO to Mr. Reilly, see Tr. 49 (Austin), nor did anyone on behalf of Mr. Reilly ever request a copy of the SFO from the GSA, see Tr. 9 (Black/Moore), 22 (Black).[5] According to Mr. Reilly, he and his staff did not learn of the SFO's contents until September 2, 2011, when they received the SFO in response to a Freedom of Information Act ("FOIA") request. Pl.'s Mot. J. Admin. R. 3 (Feb. 3, 2012); Second Reilly Decl. ¶ 17.

Like the Notice, the SFO stated that the GSA was seeking approximately 30,000 rentable square feet of office space; that "the building must be Class A office space at the time of award"; and that "the space must be located on a single floor of contiguous space." AR 760. Unlike the Notice, however, the SFO referenced and incorporated the DoD Standards. See AR 760-61. In its cover letter forwarding the SFO to the five potential offerors, the GSA heeded, "If the agency will occupy 25% or more of the usable area of any of the offered buildings, pay attention to the special requirements in paragraph 1.2B of the SFO." AR 812-13. Paragraph 1.2(B) of the SFO stated that "in instances where this requirement will occupy more than 25% of the building: the facility and site shall comply with all applicable Anti-Terrorism/Force Protection (AT/FP) requirements (refer to 'DoD Minimum Antiterrorism Standards for Buildings' – UFC 4-010-01)." AR 760. Sub-paragraphs 1.2(B)(1)-(2) further stated that a building with a controlled perimeter must have a standoff distance of 82 feet, while a building without a controlled perimeter must have a standoff distance of 148 feet. Id.

In addition, the DoD Standards include alternative means of compliance for existing buildings that do not satisfy the minimum standoff distances. For example, the DoD Standards state that "where providing the minimum standoff distance is not possible . . . lesser standoff distances may be allowed where the required level of protection can be . . . achieved through analysis or . . . through building hardening or other mitigating construction or retrofit." § 2-4.8.2. Alternatively, where building retrofits are

---

[5] Throughout this opinion, "Tr." refers to the transcript of the oral argument in this case held on March 14, 2012 at the National Courts Building in Washington, DC.

"impractical," "operational options" can be used, such as "establishing access control for authorized parking at [specified] standoff distances." § 2-4.8.3. Mr. Reilly emphasizes that, unlike the SFO, the Notice did not "refer to or incorporate the DoD Antiterrorism Standards, including any of the alternative means of meeting the setback requirements." Pl.'s Mot. J. Admin. R. 11 (Feb. 3, 2012).

In response to the SFO, Cannery was the only offeror to submit a formal lease proposal, which it did on June 8, 2010. See AR 1173, 1366. The GSA subsequently awarded Lease No. GS-09B-02386 (hereinafter "the lease") to Cannery on September 29, 2010. See AR 1476.

Despite his position as the incumbent lessor, Mr. Reilly maintains that he did not learn until May 31, 2011 that the GSA had awarded the lease to Cannery. Pl.'s Mot. J. Admin. R. 3 (Feb. 3, 2012); Second Reilly Decl. ¶ 10. During oral argument in this case, counsel for the Government represented that the GSA did not post the September 29, 2010 lease award on FedBizOpps due to an agency oversight. Tr. 53, 57 (Austin). Moreover, Mr. Reilly maintains that between February 2010 and May 2011, he, Mr. Hohenhaus, and other members of his staff "repeatedly attempted" to contact GSA representatives concerning the solicitation but received no response from the GSA. Second Reilly Decl. ¶ 6. During the same period, Mr. Reilly claims the on-site MEPS personnel informed his staff that the MEPS would not be relocating. Id. ¶ 7. Based upon this information and the lack of information from the GSA, Mr. Reilly "concluded . . . that a decision had been made to remain at [his] Property and that MEPS would extend the Lease." Id. ¶ 9.

Although Mr. Reilly maintains he did not learn of the lease until May 31, 2011, he admits that he learned in February 2011 that the GSA was considering The Cannery. See id. Christian Diggs, the Leasing Manager for Clinton Reilly, represented that on February 15, 2011, Major Pruiett, "who was in charge of MEPS' operation," informed him that the GSA was considering relocating the MEPS to The Cannery. Diggs Decl. ¶¶ 3, 9. At that time, Major Pruiett told Mr. Diggs that "'the train has left the station and it is up to us to stop it.'" Id. ¶ 9 (quoting Major Pruiett). As a result, Mr. Diggs represented that he and other members of Mr. Reilly's staff created a document entitled, "MEPS Alternative Scenario Memorandum," which "highlighted" The Cannery's "multiple violations of MEPS' requirements." Id. ¶ 10.

Mr. Reilly maintains that when he affirmatively learned on May 31, 2011 of the GSA's lease with Cannery, he "immediately contacted [his] attorneys." Second Reilly Decl. ¶ 11. On June 10, 2011, counsel for Mr. Reilly filed a bid protest (B-405190) with the GAO, challenging the GSA's lease award to Cannery. Id.; see also AR 1783-1803. On July 13, 2011, the GAO dismissed Mr. Reilly's protest as untimely. See AR 1816-18.

6

While Mr. Reilly's protest was pending at the GAO, his counsel submitted a FOIA request to the GSA "to garner additional information" about the GSA's lease with Cannery.  Second Reilly Decl. ¶ 12; Pl.'s Mot. J. Admin. R. 36 (Feb. 3, 2012).  In that same timeframe, Mr. Reilly reports that his staff was in regular contact with MEPS personnel, who allegedly thought it was a mistake to relocate to The Cannery and "were doing everything in their power to cancel the lease."  Second Reilly Decl. ¶ 16.  Based upon the representations of MEPS personnel, Mr. Reilly "understood that there was an internal battle going on between the GSA and the MEPS concerning the plan to move to the Cannery."  Id.

In response to the FOIA request, the GSA provided Mr. Reilly with a copy of its lease with Cannery, as well as a copy of the SFO, on September 2, 2011.  Id. ¶ 17.[6]  According to Mr. Reilly, "[t]his was the first time that either myself or my staff had seen SFO No. 9CA2463 or the contents therein including, . . . the incorporation of the Department of Defense Minimum Antiterrorism Standards for Buildings."  Id.

Despite receiving a copy of the GSA's lease with Cannery, Mr. Reilly continued to believe that the MEPS was not moving, in apparent reliance on statements from certain MEPS personnel to that effect.  See Second Reilly Decl. ¶¶ 19-21.  In mid-September 2011, Mr. Reilly states that he wrote a letter to Captain Eric Johnson, the National Director of MEPS, "offering to meet in Washington, DC to confirm [Johnson's] statements to MEPS personnel that MEPS would not be relocating."  Id. ¶ 20.  According to Mr. Reilly, Major Pruiett called him on October 24, 2011 and told him that he would not be meeting with Captain Johnson and that, "despite MEPS' efforts to overturn the move to the Cannery, MEPS was moving to the Cannery."  Id. ¶ 23.  After that telephone call, Mr. Reilly states that he "immediately" contacted his attorneys.  Id. ¶ 24.

III.  <u>Litigation History</u>

Counsel for Mr. Reilly filed this post-award challenge on November 21, 2011, protesting the lease award to Cannery and requesting declaratory and injunctive relief.  On December 2, 2011, Cannery filed a motion to intervene, which the Court granted the same day.  Mr. Reilly filed an amended complaint on January 11, 2012, as well as a motion for a preliminary injunction and, as necessary, a temporary restraining order, requesting the Court to prohibit the GSA from authorizing further performance of the lease until the Court could decide Mr. Reilly's protest on the merits.  After hearing oral argument, the Court denied Mr. Reilly's application for a TRO on January 20, 2012.

On February 3, 2012, Mr. Reilly filed a motion for judgment on the administrative record.  On February 24, 2012, the Government filed a motion to dismiss for lack of

---

[6] As Plaintiff notes in its Motion for Judgment on the Administrative Record, the GSA's FOIA response is dated August 31, 2011, but Mr. Reilly's second declaration states that he did not receive the information until September 2, 2011.  Pl.'s Mot. J. Admin. R. 3 n.1 (Feb. 3, 2012).

subject matter jurisdiction and an alternative cross-motion for judgment on the administrative record. Likewise, on February 24, 2012, Defendant-Intervenor, Cannery filed a response to Mr. Reilly's motion and a cross-motion for judgment on the administrative record. The parties subsequently filed responses and replies in support of their respective motions for judgment on the administrative record. After carefully considering the parties' positions, the Court concludes that Reilly's claims should be dismissed as untimely.

Discussion

As noted above, the GSA decided in early 2010 not to consider leasing the Reilly property because it does not meet the 83-foot setback requirement set forth in the Notice. See AR 1826. Mr. Reilly contends that this decision violated the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006), because the agency subsequently relaxed the setback requirement by incorporating the DoD Standards, with their alternative means of compliance, in the SFO. See Pl.'s Mot. J. Admin. R. 22 (Feb. 3, 2012). Had the GSA applied the same standards to the Reilly property, Mr. Reilly maintains that he would have had a substantial chance of winning the lease award. Id. at 23. In addition, Mr. Reilly asserts that it was arbitrary and capricious for the GSA to award the lease to Cannery because it had no reasonable basis to conclude that The Cannery met the setback requirement in the Notice or SFO. Id.

The Government first argues that this Court does not possess jurisdiction to hear Reilly's complaint because Mr. Reilly is not an "interested party," within the meaning of the Tucker Act, 28 U.S.C. § 1491(b), and thus, he does not have standing to challenge the GSA's procurement decisions, Def.'s Mot. 17 (Feb. 24, 2012). In particular, the Government contends that Mr. Reilly is not an interested party because he: (a) never submitted a proposal in response to the SFO, id. at 17; and (b) would not have had a substantial chance of winning the award, even if he had submitted a proposal, id. at 25. In the alternative, the Government asserts that the Court should grant its motion for judgment on the administrative record because the GSA's award to Cannery was rational and reasonable, as The Cannery fell within the 25% exemption from the setback requirement. Id. at 28.

Like the Government, Cannery contends that Mr. Reilly lacks standing to pursue his protest. Cannery's Cross-Mot. 10 (Feb. 24, 2012). In addition, Cannery asserts that Mr. Reilly unreasonably delayed in filing his protest such that it should be dismissed as untimely. Id. at 13-15.

The Court is persuaded that Mr. Reilly unreasonably delayed in filing the present action and that his claims are barred by the doctrine of laches. Because of the unique circumstances of this case, however, the Court wishes to address first the parties' arguments on standing.

I.   Standing

"Standing is a threshold jurisdictional issue" that must be met in any protest. Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998)). To establish standing under the Tucker Act, 28 U.S.C. § 1491(b), a protester must show that it is an "interested party," meaning that it is: (a) "an actual or prospective bidder[] or offeror[]"; (b) whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

In arguing that Mr. Reilly is not an interested party, the Government makes two related arguments based upon Mr. Reilly's actions prior to the close of the bidding process. First, the Government contends that Mr. Reilly is not an actual or prospective offeror because he failed to submit a proposal in response to the SFO. Def.'s Mot. 17 (Feb. 24, 2012). Second, the Government asserts that Mr. Reilly waived his right to contest the terms of the Notice because he did not protest before the close of the bidding process. Id. at 22-23. As explained below, both of the Government's arguments are weakened by the fact that before the bidding process closed, Mr. Reilly lacked pertinent information that inhibited him from submitting a proposal or protesting the terms of the Notice.

A.  Actual or Prospective Offeror

It is uncontested that Mr. Reilly did not submit a proposal in response to the SFO. Mr. Reilly argues, however, that he is "effectively an 'actual offeror' for purposes of challenging GSA's decision to exclude him from the competition" because he submitted an expression of interest in response to the Notice. Pl.'s Mot. J. Admin. R. 19 (Feb. 3, 2012). Whether styled as an actual or prospective offeror, the Court agrees.

In KSD, Inc. v. United States, 72 Fed. Cl. 236 (2006), this Court held that "when the government's actions wrongfully prevent a bidder from qualifying for or bidding on a solicitation, the government cannot use the contractor's failure to qualify or bid on the solicitation as grounds for finding a lack of standing." Id. at 247. In KSD, the plaintiff argued that the government erroneously withheld technical data, thereby preventing KSD from obtaining the necessary approvals to supply the helicopter components being procured by the Army. Accepting KSD's allegations as true, the Court denied the defendant's and intervenor's motions to dismiss on the basis that it was the Army's actions that prevented KSD from gaining the necessary approvals. Id. at 247-48. Moreover, the Court found sufficient for standing purposes the fact that KSD demonstrated its interest in the procurement through meetings with, and letters to, the Army, even though KSD did not submit a formal proposal in response to the pre-solicitation notice. Id. at 249.

Similarly, in Cybertech Group Inc. v. United States, 48 Fed. Cl. 638 (2001), the Court found that the plaintiff had standing where the agency precluded the plaintiff from submitting a bid by failing to provide the plaintiff with a Request for Quotations. Id. at 644.

As in KSD and Cybertech, the Court finds that the Government's actions inhibited Mr. Reilly from submitting a proposal. It is uncontested that in early 2010, GSA leasing specialist, Ms. Aranda informed Reilly's broker, Mr. Hohenhaus that the GSA would not consider the Reilly property for the MEPS because it did not meet the 83-foot setback requirement. On that basis, the GSA did not give Mr. Reilly a copy of the SFO, see Def.'s Mot. 20 (Feb. 24, 2012), and Mr. Reilly never submitted a proposal, see Pl.'s Mot. J. Admin. R. 19 (Feb. 3, 2012). As discussed more fully below, the Court finds it curious that Mr. Reilly never simply asked the GSA for a copy of the SFO. As of early 2010, however, Mr. Reilly had no reason to request the SFO because according to the Notice, the Reilly property did not meet the 83-foot setback requirement, and Mr. Reilly did not yet know that alternatives may exist to satisfy the safety standards. At that point, based upon the information in the Notice, Mr. Reilly had little incentive to submit a proposal and without the SFO, limited means to do so. The Government cannot use Mr. Reilly's failure to bid on the solicitation as grounds for lack of standing.

Moreover, Mr. Reilly demonstrated adequate interest in the solicitation to qualify as an actual or prospective offeror. Not only did Mr. Reilly submit an expression of interest in response to the Notice, but he was also the 15-year incumbent lessor. As such, the Court finds Mr. Reilly's initial communications with the GSA sufficient for him to qualify as an actual or prospective offeror for standing purposes.

### B. Waiver

In a related argument, the Government contends that Mr. Reilly waived his right to contest the terms of the Notice because he failed to protest before the conclusion of the bidding process. See Def.'s Mot. 20 (Feb. 24, 2012). In support of its argument, the Government relies on the Federal Circuit's decision in Blue & Gold, Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007). In Blue & Gold, the Federal Circuit held that:

> a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Id. at 1313.

The instant action is distinguishable from Blue & Gold. As this Court pointed out in Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750 (Fed. Cl. 2007) ("KCI"), the protester in Blue & Gold "knew of the relevant agency policy prior to the close of the bidding process." Id. at 759 (citing Blue & Gold, 492 F.3d at 1313). By contrast, in KCI, the protester did not become aware of the alleged defect in the solicitation until after the close of bidding. Id. Only after the Government filed the administrative record in the court action did KCI receive the documents necessary to challenge the solicitation. Id. Under such circumstances, the Court held that KCI's "failure to raise its claim prior to the close of the bidding process [did] not constitute a knowing waiver of its rights." Id.

Here, unlike in Blue & Gold, the Notice did not contain a patent error. By the terms of the Notice, the GSA required an 83-foot setback, and the Reilly property did not meet that requirement. Accordingly, Mr. Reilly had no reason to protest his exclusion from the competition before the close of the bidding process. According to the SFO, offers were due by June 8, 2010, and the solicitation remained open until the GSA awarded the lease to Cannery on September 29, 2010. See AR 761. As discussed below, Mr. Reilly did not learn of his protest grounds until February 2011, when he found out that the GSA was considering The Cannery to house the MEPS. See Second Reilly Decl. ¶ 9. Thus, Mr. Reilly did not learn of his protest grounds until well after the close of the bidding process. His failure to protest the terms of the Notice prior to the close of the bidding process does not constitute a knowing waiver of his rights.

C. Direct Economic Interest

Lastly, the Government maintains that Mr. Reilly lacks standing because he has not shown that he suffered a direct economic impact as a result of the alleged defect in the Notice. Def.'s Mot. 24 (Feb. 24, 2012). A protester's direct economic interest is said to be affected when it "can show that but for the error, it would have had a substantial chance of securing the contract." Labatt Food Serv. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (internal citations omitted).

The Government maintains that Mr. Reilly did "not stand a substantial chance of receiving the award" because he failed "to satisfy other material requirements" of the procurement. Def.'s Rep. 9 (Mar. 9, 2012). Specifically, the Government alleges that "Reilly has not shown . . . how he would have been able to meet the alternative required levels of protection" set forth in the DoD Standards. Def.'s Mot. 24 (Feb. 24, 2012). In addition, the Government submits that the Reilly property contains a Class C building and falls within the 100-year flood plain in violation of the requirements of the SFO. See Def.'s Rep. 10 (Mar. 9, 2012).

For his part, Mr. Reilly states that he "is willing and able to meet the necessary force protection requirements through means other than the setback." Pl.'s Resp. 14

11

(Mar. 2, 2012). Moreover, Mr. Reilly posits that his property houses a Class A building and that a property within the 100-year flood plain is not automatically excluded from consideration under the SFO. Id.; Tr. 31-32 (Black). Mr. Reilly concludes that his property meets the minimum requirements of the SFO such that he had a substantial chance of winning the lease award. See Pl.'s Resp. 14 (Mar. 2, 2012).

On balance, Mr. Reilly has presented minimal evidence to demonstrate that if not for the alleged defect in the Notice, he would have had a substantial chance of securing the lease. In his second declaration, Mr. Reilly states that if he had known that the GSA was considering alternatives to the building setback requirement, he "could have and would have submitted an expression of interest that would have satisfied" such alternatives. ¶ 11. In his third declaration, Mr. Reilly also avers that his property houses a Class A building. ¶ 3. Other than these self-serving statements, however, Mr. Reilly has offered no evidence that his property could have been altered to satisfy the DoD Standards or that the building on the property is Class A.

Moreover, it is undisputed that the Reilly property lies within the 100-year flood plain. See Tr. 32 (Black). Section 1.7 of the SFO states that "[a]n award of contract will not be made for a property located within a base flood plain or wetland unless the Government has determined that there is no practicable alternative." AR 761. Mr. Reilly argues that section 1.7 does not preclude him from competing because "[i]t's possible if there's no practical alternative for him to be selected." Tr. 33 (Black). The Cannery, however, does not lie within the 100-year flood plain and thus, appears to be such a "practicable alternative."

Considering the entire record, the evidence strongly suggests that Mr. Reilly would not have had a substantial chance of receiving the lease award and thus, would not qualify as an interested party under the Tucker Act. The Court need not decide this issue definitively, however, because it finds that Mr. Reilly's claims are barred by the doctrine of laches.

II.  Laches

In its cross-motion for judgment on the administrative record, Cannery contends that Mr. Reilly's claims should be barred by the doctrine of laches. See Cannery's Cross-Mot. 13-15 (Feb. 24, 2012). The doctrine of laches "bars a claim when a plaintiff's 'neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party.'" Land Grantors in Henderson, Union, & Webster Counties v. United States, 86 Fed. Cl. 35, 47 (2009) (quoting A. C. Aukerman Co. v. R. L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)). The laches defense requires a showing of: (a) unreasonable and unexcused delay by the claimant; and (b) economic or defense prejudice to the opposing party. JANA, Inc. v. United States, 936 F.2d 1265, 1270 (Fed. Cir. 1991). "The period

of delay is measured from the time the claimant knew or should have known about his claim to the date of the suit." Aero Union Corp. v. United States, 47 Fed. Cl. 677, 686 (Fed. Cl. 2000) (citing A. C. Aukerman, 960 F.2d at 1032). There are "[n]o fixed boundaries" defining what length of time is unreasonable, and "the duration should be viewed in light of the circumstances." Aero Union, 47 Fed. Cl. at 686.

In the instant case, the Court finds that application of the laches doctrine is appropriate. The record shows that by February 2011, Mr. Reilly knew the facts forming the basis of his protest but did not file a protest in this Court until November 21, 2011— nine months later. On February 15, 2011, Major Pruiett informed Mr. Diggs, Reilly's Leasing Manager, that the GSA was considering relocating the MEPS to The Cannery. Diggs Decl. ¶ 9. Major Pruiett described the situation as "urgent" and commented that "the train has left the station and it is up to us to stop it." Id. In response, Mr. Diggs, along with other members of Mr. Reilly's staff, created a document entitled, "MEPS Alternative Scenario Memorandum," which highlighted The Cannery's alleged violations of the MEPS requirements. Id. at 10. According to Mr. Diggs, he submitted the memorandum to MEPS personnel on February 20, 2011. Id.

The memorandum states that The Cannery "presents a number of conflicts with guidelines established by the Department of Defense for the security of MEPS facilities," specifically noting that the property "directly abuts a major thoroughfare" in violation of the 83-foot setback requirement. Id. Ex. A. The memorandum reveals that at least by February 20, 2011, Mr. Reilly knew the GSA was considering a property that, like the Reilly property, did not meet the 83-foot setback requirement. The basis of Mr. Reilly's claim before this Court is that the GSA acted arbitrarily in excluding Reilly from the competition for failing to meet the 83-foot setback requirement, while not applying that same requirement to The Cannery. Pl.'s Resp. 16 (Mar. 2, 2012). The record shows that by February 20, 2011, Mr. Reilly knew the facts forming the basis of his claim but delayed nearly four months before filing a protest with the GAO on June 10, 2011, see AR 1783-1803, and an additional four months before filing a protest in this Court on November 21, 2011.

Mr. Reilly counters that a protest in February 2011 would have been "premature" because he did not learn until May 31, 2011 that the GSA had made a final decision in September 2010 to award the lease to Cannery. Pl.'s Repl. to Cannery 7 n.6 (Mar. 2, 2012); Tr. 21-22 (Black). The Court is skeptical that Mr. Reilly was ignorant of the lease award to Cannery from September 2010 until May 31, 2011. In Mr. Reilly's own declaration, he submits that in December 2010, he and his staff made an "extensive presentation" to the MEPS and the GSA concerning the Reilly property and extension of the lease. Second Reilly Decl. ¶ 9. It is difficult for the Court to accept that in the midst of such interactions, the GSA never mentioned, and neither Reilly nor his representatives ever learned of, the fact of the GSA's lease with Cannery. In any event, in asserting that a protest in February 2011 would have been premature, Mr. Reilly ignores the fact that by

13

this time, he knew the basis of his claim: namely, that The Cannery had <u>not</u> been excluded from consideration despite failing to meet the 83-foot setback requirement.

Moreover, even if measured from May 31, 2011,[7] the Court finds that Mr. Reilly's delay in filing the instant protest was unreasonable and unexcused. In the case of a bid protest, in particular, this Court has explained that a plaintiff cannot sit on his rights while allowing the Government to move forward on a contract. <u>See</u> <u>Benchmade Knife Co. v. United States</u>, 79 Fed. Cl. 731, 737 (2007) (citing <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1314 (Fed. Cir. 2007)); <u>CW Gov't Travel, Inc. v. United States</u>, 61 Fed. Cl. 559, 569 (Fed. Cl. 2004) (noting that "[i]n the context of a bid protest, 14 months is a lifetime"). Accordingly, in <u>Software Testing Solutions, Inc. v. United States</u>, 58 Fed. Cl. 533 (2003), this Court found a "strong argument in favor of applying laches" where the plaintiff waited two months to file suit and his only explanation was that he was weighing the cost of litigating the matter. <u>Id.</u> at 536.

Here, Mr. Reilly waited at least twice as long to file the instant protest. Mr. Reilly maintains that he learned for the first time on May 31, 2011 that the GSA had executed the lease with Cannery in September 2010. Second Reilly Decl. ¶¶ 10-11. Upon learning of the lease, Mr. Reilly submits that he "immediately" contacted his attorneys, who shortly thereafter filed a protest at the GAO on June 10, 2011. <u>Id.</u> ¶ 11; <u>see also</u> AR 1783-1803. Once the GAO dismissed his protest, however, Mr. Reilly waited over four additional months to file a protest in this Court. The GAO dismissed Reilly's protest as untimely on July 13, 2011, <u>see</u> AR 1816-18, but Mr. Reilly did not file the present action until November 21, 2011.

To explain his delay, Mr. Reilly provides two primary justifications, both of which the Court finds inadequate. First, Mr. Reilly explains that in the interim, he was "collecting more information about potential protest grounds through the FOIA process." Pl.'s Repl. to Cannery 8 (Mar. 2, 2012). In that regard, Mr. Reilly emphasizes that he did not receive the SFO in response to his FOIA request until September 2, 2011, thereby reducing his delay to two and one half months. <u>See</u> Tr. 21-22 (Black).[8] Mr. Reilly admits, however, that neither he nor any of his representatives ever asked the GSA for a copy of the SFO. <u>See</u> Tr. 22 (Black). Given the apparent breadth of Mr. Reilly's FOIA request, <u>see</u> Second Reilly Decl. ¶¶ 17-18, and the often inconsistent response times

---

[7] Plaintiff concedes that by May 31, 2011, Mr. Reilly knew of his claim. Tr. 28 (Black) ("And we submit that the record's clear, May 31, 2011 is the first time he had reason to know that the Government's requirements had changed, and those were the exact same requirements that he had been excluded from. That's the moment his claim arose."); Pl.'s Repl. to Cannery 7 (Mar. 2, 2012).

[8] During oral argument, counsel for Mr. Reilly stated that receiving the SFO on September 2, 2011 reduced Reilly's delay by <u>three</u> and one half months, <u>see</u> Tr. 21-22 (Black); however, the Court assumes counsel misspoke, as the difference between September 2, 2011 and November 21, 2011 (when Reilly filed the instant action) is only <u>two</u> and one half months.

associated with such requests, the Court finds it unreasonable for Mr. Reilly to have waited for a response to his FOIA request while not even asking the GSA for a copy of the SFO.  Furthermore, Mr. Reilly did not need to collect more information about his potential protest grounds.  At set forth above—and as evidenced by his GAO protest—Mr. Reilly already knew the pertinent facts of his claim by May 31, 2011 at the latest.

Second, Mr. Reilly explains that between July 2011 and October 2011, he was communicating with MEPS personnel, who represented that they were attempting to convince the GSA to cancel its lease with Cannery and maintain the MEPS at the Reilly property.  See Pl.'s Repl. to Cannery 8 (Mar. 2, 2012); Tr. 20-21 (Black); Second Reilly Decl. ¶ 16.  According to Mr. Reilly, there was "an internal battle going on between the GSA and the MEPS concerning the planned move to Cannery."  Second Reilly Decl. ¶ 16.  While this internal battle was going on, Mr. Reilly concedes that he "was passively waiting to see how [the] inter-agency dispute between MEPS and GSA would be resolved."  Pl.'s Repl. to Cannery 8 n.7 (Mar. 2, 2012); see also Tr. 21-22 (Black) ("And again, he's still waiting to see how MEPS and GSA will resolve their thing, their interaction about the status of the lease.").  During this time, Mr. Reilly "maintained the view that it would not be appropriate to file a lawsuit against the Government while efforts were ongoing to secure cancellation of the lease."  Second Reilly Decl. ¶ 22.  According to Mr. Reilly, Major Pruiett called him on October 24, 2011 and said that, "despite MEPS' efforts to overturn the move to the Cannery, MEPS was moving to the Cannery."  Id. ¶ 23.  Only then was Mr. Reilly convinced that the GSA was moving forward with the Cannery lease.  See id. ¶ 24.  Approximately one month later, Mr. Reilly filed the instant action.

The Court does not quarrel with Mr. Reilly's representations that MEPS personnel wanted to remain at his property.  However, in choosing to rely on the efforts of the MEPS personnel, rather than timely filing a bid protest, Mr. Reilly simply chose to put all his eggs in one basket—ultimately to his detriment.  A plaintiff may choose to sit on his rights while a government contract proceeds, but he will be barred from protesting if the Government is prejudiced as a consequence.

In Blue & Gold, 492 F.3d at 1314, the Federal Circuit stated that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm."  The Court explained that "[i]t would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation."  Id.  Although the circumstances in Blue & Gold differ from the present case, the same principle applies.  Mr. Reilly knew of his challenge to the Cannery lease, rolled the dice to see if MEPS personnel could secure cancellation of the lease, and only after they were unsuccessful, finally filed a protest in this Court.  In the meantime, the GSA and Cannery were proceeding at a cost.

Although the parties did not brief the issue extensively, the record demonstrates that the Government would be economically prejudiced if the Court granted Mr. Reilly's requested relief. Such an order would require the Government to terminate or breach its current contract with Cannery, thereby obliging it to pay damages to Cannery. Mr. Reilly concedes that Cannery has progressed on tenant improvements and made expenditures in the process. See Pl.'s Mot. 39 (Feb. 3, 2012). Moreover, the lease between the GSA and Cannery does not contain a termination for convenience clause, see AR 1837-40; Tr. 65 (Austin), which would allow the Government to terminate the contract when it is in the Government's interest. By virtue of Mr. Reilly's delay, the Government would be required to incur costs it otherwise could have avoided. The doctrine of laches precludes such an outcome.

### III. Judgment on the Administrative Record

Finally, the Court notes that the administrative record lends support to the Government's position that the agency both considered The Cannery's ability to meet the setback requirement, see AR 565, 1853, and determined that The Cannery in fact met the setback requirement by way of the 25% exemption, see AR 1170, 1173-74, 1251-52, 1853. Nonetheless, because the Court has concluded that Reilly's claims are untimely, it need not resolve whether the GSA's award to Cannery was reasonable.

### Conclusion

Based upon the foregoing, the Court DISMISSES Reilly's claims as untimely and need not reach the parties' cross-motions for judgment on the administrative record.

In addition, during oral argument on March 14, 2012, counsel for Plaintiff made a motion to exclude Appendix 1 to the Government's reply brief. See Tr. 30 (Black). The Court GRANTS Plaintiff's motion.

This decision is filed under seal. On or before April 4, 2012, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court any proposed redactions before the opinion is released for publication.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge